[Cite as *In re K.T.*, 2026-Ohio-1872.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

IN RE K.T., ET AL.

[Appeal by N.W., Mother]

:
:
:
:

No. 115818

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** May 21, 2026

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. AD24902691 and AD24902692

---

### *Appearances:*

Scott J. Friedman, *for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Lindsay N. Molnar, Assistant Prosecuting
Attorney, *for appellee.*

MARY J. BOYLE, J.:

{¶ 1} Appellant N.W. ("Mother") appeals the decision of the Cuyahoga County Juvenile Court terminating her parental rights and awarding custody of two of her minor sons, K.T., born June 2019 ("Older Boy"), and S.T., born April 2021 ("Younger Boy") (collectively "the Boys"), to the Cuyahoga County Division of

Children and Family Services ("the agency"). After careful review of the record, we affirm the juvenile court's decision.

**Facts and Procedural History**

{¶ 2} Mother has eight children. The oldest son and oldest daughter are emancipated. Mother has another son born in 2007 and three daughters born between 2010 and 2013. These children live with their paternal grandmother, and they are not parties to this appeal.

{¶ 3} The agency became involved with the children in fall 2023, when both Mother and father were jailed for domestic violence. (6-12-24 tr. 16-17.)[1] However, that child intervention case could not be resolved within the statutory deadline, and the agency dismissed that case and filed the complaint for the present case on March 18, 2024. Thus, the children have remained in the uninterrupted custody of the agency since November 21, 2023, when the children were committed to the predispositional custody of the agency. (6-12-24 tr. 17; trial exhibit Nos. 5 and 6.)

{¶ 4} In addition to the domestic violence, the March 18, 2024 complaint avers that Mother did not have a safe and appropriate house for her children and that she lacked the necessary judgment and decision-making skills to care for her children because of, inter alia, her behavior, her depression, and lack of sobriety because of alcohol. The children were continued in predispositional custody. The agency offered Mother substance-abuse assessment and treatment, domestic-

---

[1] Unless otherwise specified, reference to the transcript is from the October 28, 2025 hearing for permanent custody.

violence and mental-health services, and referral to the neighborhood collab to address the housing problem. (3-18-24 tr. 11.)

{¶ 5} In June 2024, the juvenile court adjudicated the Boys neglected and dependent and granted temporary custody to the agency. Mother stipulated to the amended complaint that specified the following: Mother needs to attend and benefit from domestic-violence classes, successfully complete behavioral health services, demonstrate she can co-parent, provide safe, clean, and appropriate housing,[2] to complete substance-abuse treatment and to maintain sobriety.

{¶ 6} Initially, the Boys were placed with their maternal grandmother. However, the agency determined that the placement was inappropriate. The Boys were then placed with their older sister in September 2024. However, on November 21, 2024, the agency took custody of the Boys because the older sister was not properly caring for them and placed them in a foster home. The Younger Boy had missed medical appointments, had pneumonia, had difficulty in swallowing, and was malnourished. (4-10-2025 tr. 12-13 and tr. 38-43.)

{¶ 7} On December 23, 2024, the agency moved for permanent custody. At the April 10, 2025 hearing for arraignment on the permanent custody motion before a magistrate, social worker Dominque Emory testified that Mother's case plan consisted of housing, mental-health services, substance-abuse treatment, and parenting classes. She noted that the holes in the home had been patched and

_____

[2] The initial reports of the home were that it contained rodents, spoiled food, exposed wiring, and holes in the ceiling. (Apr. 17, 2024 Family Case Plan.)

painted, but that the bathroom floor looked unsafe. (4-10-2025 tr. 13.) However, she had not been in the house recently. (4-10-2025 tr. 9-10.) Moreover, Mother was not currently enrolled in any services and the random drug tests had come back positive for alcohol. (4-10-2025 tr. 10.) Mother visited the Boys every week, except for two missed visits. Mother brought food and other things for the Boys. However, she did not interact with them; she gave them her cell phone, and they played with that. (4-10-2025 tr. 11-12.) Emory further testified that the father wanted nothing to do with the agency and had not done anything with the case plan.

{¶ 8} On August 18, 2025, the juvenile court judge conducted an arraignment on the permanent-custody motion. The agency had not perfected service on the father; his lawyer said that the father would not be able to make the hearings because of work but wanted the lawyer to represent what he wanted in the case. (8-18-2025 tr. 5.) The social worker stated that Mother had completed parenting classes in June 2025, but that was the only compliance. Mother's last random drug screen was in December 2024 and that was positive for alcohol. (8-18-2-25 tr. 19 and 21.) Moreover, the social worker had not been in Mother's home since March 2024, and she believed that Mother and father were residing together. (8-18-2025 tr. 19.)

{¶ 9} The juvenile court conducted the trial for permanent custody on October 28, 2025. The father's attorney admitted that he had no contact with the father since March 2025. The father was not at the hearing. Social worker Emory

testified and reiterated that the father had not engaged with the case plan and did not want anything to do with the agency. (Tr. 29-30.)

{¶ 10} Emory testified that Mother's case plan was to conduct a mental-health assessment and follow any recommendations ordered concerning substance abuse, parenting, housing, and meeting the basic needs of her children. (Tr. 22.) Emory continued that the agency had referred Mother to Moore Counseling and Mediations Services to address the mental-health concerns, but she was discharged from the program unsuccessfully because she missed appointments and did not follow through with recommendations, which included six to nine months of intensive outpatient care. Even after regaining medical benefits, Mother did not complete the engaged services. (Tr. 22-23 and 66.)

{¶ 11} Emory testified that to address substantive abuse she asked Mother to conduct random drug screenings, at least once a month. However, there had been no drug screenings since December 2024. Emory had referred Mother to Moore Counseling and Mediation and the St. Martin de Porres Collab, but Mother did not follow through. (Tr. 23-24.) The agency seeks a minimum of six months of documented sobriety before allowing extended visits. (Tr. 67.)

{¶ 12} Emory testified that Mother had successfully completed parenting classes and visited with the Boys. (Tr. 24-25.) From her observations of the visits, Emory concluded that Mother and the Boys love each other. However, there is very little interaction among Mother and the Boys. She gives them a phone or a tablet,

and the Boys play with those. Emory thought that this exposed the Boys to inappropriate material. (Tr. 32-33.)

{¶ 13} Emory said that at the beginning of the custody case, Mother's home was in deplorable condition, with trash, wires, and holes throughout the house. However, Emory testified that she had not been inside the house. Attempts were made to inspect the house when Mother was there, but Mother was not present at the time of the inspections. (Tr. 25-26.)

{¶ 14} Emory confirmed that Mother was engaged with Able Counseling to address anger-management and domestic-violence concerns, but Emory was uncertain about the progress report she received from Able. (Tr. 27.) Moreover, Emory questioned the efficacy of Mother's participation because too many of the sessions were Zoom sessions; Emory opined that to be effective the sessions needed to be in person. (Tr. 54.) Nor did Emory think that the one report from Able was sufficient to show progress. (Tr. 55.)

{¶ 15} Emory on cross-examination from the guardian ad litem ("GAL") testified that the Older Boy was very behind academically, but in foster care has improved greatly. Similarly, the Younger Boy was having all of his medical and other needs met in foster care. (Tr. 73-74.)

{¶ 16} Mother presented Mona Hdeib of Able Counseling for her case. Hdeib testified that Mother has been involved in traditional therapy sessions, both group and individual, for at least a month and a half. (Tr. 78-79.) Thus, Mother was about halfway through anger management and domestic violence programs, after which

Able Counseling would present her with a certificate. (Tr. 80-81.) Hdeib believed that Mother has shown much improvement and progress. (Tr. 83.)

{¶ 17} The GAL recommended that the agency have permanent custody of the Boys. Despite the Boys having been in the agency's custody for 23 months, Mother had not completed her case plan. She never completed a substance-abuse assessment and the one drug testing came back positive for alcohol. The agency could not confirm the suitability of Mother's home. Mother was living with father with whom she had a physically abusive relationship, and she had not finished her domestic-violence program. Moreover, the Boys were doing well in their foster home.

{¶ 18} On October 29, 2025, the juvenile court granted the agency's motion for permanent custody of the Boys. The court found that the father had abandoned the Boys. Furthermore, the Boys had been in the custody of the agency for more than 12 months of a consecutive 22-month period and the Boys will soon no longer qualify for temporary custody pursuant to R.C. 2151.415(B) and could not be placed with one of the Boys' parents within a reasonable period of time or should not be placed with either parent. Pursuant to R.C. 2151.414(E), Mother failed to substantially remedy the conditions causing the Boys to be placed outside of their home.

{¶ 19} Mother timely appealed and raised the following assignment of error.

> The juvenile court erred in terminating Mother's parental rights in violation of her rights under the Fourteenth Amendment of the United States Constitution and Article I, Section 16 of the Ohio Constitution.

**Law and Analysis**

{¶ 20} Initially, we recognize that the right to raise one's own child is "an 'essential' and 'basic civil right.'" *In re Murray*, 52 Ohio St.3d 155, 156, (1990), quoting *Stanley v. Illinois*, 405 U.S. 645, (1972); *In re B.B.C.*, 2024-Ohio-588, ¶ 14, (8th Dist.). "Parents have a 'fundamental liberty interest' in the care, custody, and management of the child." *Id.*, quoting *Santosky v. Kramer*, 455 U.S. 745, 753, (1982). This right, however, is not absolute. "'The natural rights of a parent are not absolute, but are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.'" *In re Cunningham*, 59 Ohio St.2d 100, 106, (1979), quoting *In re R.J.C.*, 300 So.2d 54, 58 (Fla. App. 1974).

{¶ 21} Mother clarifies in her brief that what she is actually arguing is the decision to terminate her parental rights was not supported by sufficient evidence and was against the manifest weight of the evidence. We note that while "sufficiency and manifest weight are distinct legal concepts, a finding that a judgment is supported by the manifest weight of the evidence necessarily includes a finding that sufficient evidence supports the judgment." *In re R.M.*, 2024-Ohio-1885, ¶ 46 (8th Dist.), citing *In re P.S.*, 2023-Ohio-144, ¶ 30 (8th Dist.), citing *In re C.N.*, 2015-Ohio-2546, ¶ 9 (10th Dist.), citing *State v. Howze*, 2013-Ohio-4800, ¶ 10 (10th Dist.). Therefore, we will review this matter under the manifest-weight-of-the-evidence standard.

{¶ 22} In the case of *In re Z.C.*, 2023-Ohio-4703, the Supreme Court of Ohio reexplained the manifest-weight-of-the-evidence standard stating that

[w]hen reviewing for manifest weight, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. [*Eastley v. Volkman*, 132 Ohio St. 3d 328, 2012-Ohio-2179, ¶ 20, 972 N.E.2d 517]. "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21. "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 10 Ohio B. 408, 461 N.E.2d 1273 (1984). "'If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.'" *Id.* at fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, at 191-192 (1978).

*Id.* at ¶ 14.

### Permanent Custody — R.C. 2151.414(B)(1)

{¶ 23} R.C. 2151.414(B)(1) sets forth a two-pronged analysis for juvenile courts to apply when determining whether to grant a motion for permanent custody. Permanent custody may be granted to the agency if the trial court determines, by clear and convincing evidence, that (1) any one of the five factors set forth in R.C. 2151.414(B)(1)(a)-(e) exists, and (2) permanent custody is in the best interest of the child after considering the factors set forth in R.C. 2151.414(D)(1). "'Clear and convincing evidence is that measure or degree of proof which is more than a mere "preponderance of the evidence," but not to the extent of such certainty as is required "beyond a reasonable doubt" in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be

established.'" *In re Z.C* at ¶ 7, quoting *Cross v. Ledford*, 161 Ohio St. 469, (1954), paragraph three of the syllabus.

{¶ 24} In the instant case, the juvenile court found pursuant to R.C. 2151.414(B)(1)(d) that the Boys had been in the temporary custody of a public-children services agency under one or more separate orders of disposition for twelve or more months of a consecutive 22-month period. The evidence established the Boys had been in the agency's uninterrupted custody since November 21, 2023. The juvenile court had granted the agency temporary custody of the Boys in June 2024, and the permanent custody hearing was on October 28, 2025. Thus, the first prong of R.C. 2151.414(B) is established by clear and convincing evidence.

{¶ 25} Having found that the juvenile court properly determined that at least one of the R.C. 2151.414(B)(1) factors applies by clear and convincing evidence, we must next determine whether the juvenile court appropriately found by clear and convincing evidence that granting permanent custody to the agency is in the Boys' best interest under R.C. 2151.414(D).

**Best Interest Determination under R.C. 2151.414(D)**

{¶ 26} In determining whether permanent custody is in the child's best interest, the juvenile court must consider the relevant factors set forth in either R.C. 2151.414(D)(1) or (D)(2). *In re U.B.,* 2025-Ohio-1265 ¶ 27 (8th Dist.). Pursuant to (D)(1) the court found the following:

> Upon considering the interaction and interrelationship of the child with the child's parents, siblings, relatives, and foster parents; the wishes of the child; the custodial history of the child, including whether

the child has been in temporary custody of a public children services agency or private child placing agency under one or more separate orders of disposition for twelve or more months of a consecutive twenty-two month period; the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody; and, the report of the Guardian ad Litem, the Court finds by clear and convincing evidence that a grant of permanent custody is in the best interests of the child and the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent.

{¶ 27} The record clearly and convincingly supports the juvenile court's findings. The father abandoned the Boys by not trying to effect the case plan, by not appearing at court hearings, and by making it clear that he wanted nothing to do with the agency.

{¶ 28} The Mother's argument is to highlight her partial compliance with the case plan. The GAL at the June 2024 hearing said the concerns about the Mother's home had been remedied. Mother had completed the parenting classes and was actively engaged in anger-management and domestic-violence counseling. She was taking medication for her depression and regularly visited her children. Thus, she concluded that the evidence failed to support the juvenile court's conclusion that Mother failed to remedy the conditions that led to her children's removal.

{¶ 29} However, a closer examination of the evidence clearly and convincingly establishes that the juvenile court properly ruled that permanent custody was in the Boys' best interest. Despite having nearly two years to effectuate the case plan and despite multiple referrals from the agency, Mother did not complete the case plan and establish that she had remedied the causes for the

removal of her children. She did not establish sobriety. She refused to submit drug screenings after December 2024, and that screening was positive for alcohol. She did not remedy the domestic violence that resulted in her and the father being sent to jail and being the catalyst that caused the agency's involvement. She continued to live with the father. She undertook domestic-violence services too late to be completed within the scope of the case plan. Similarly, she eschewed the mental-health services from Moore Counseling and its intensive outpatient recommendation. Instead, she undertook mental-health services with Able Counseling and it was too late to be completed timely. She did not establish that she could provide the Boys with safe housing. She was never present when the agency went to view her home. In his October 19, 2025 report, the GAL noted that the agency had not gotten access to Mother's home. When she visited the Boys, she did not interact with them; she handed off her role as mother to her cell phone and a tablet.

{¶ 30} In contrast, the Boys are doing well in foster care. The Older Boy was behind academically. Now he is improving in school and now just a little behind. The Younger Boy was malnourished and missing necessary medical appointments. Now he too has improved. Their needs are being met. (4-10-25 tr. 14, tr. 39-44, 73-74, and 117.)

**Conclusion**

{¶ 31} In light of the foregoing, we find that there is clear and convincing evidence in the record to support the juvenile court's determination that permanent

custody to the agency is in the Boys' best interest.  We further find the court's decision to grant permanent custody to the agency is not against the weight of the evidence.

{¶ 32} Accordingly, the assignment of error is overruled.

{¶ 33} Judgment is affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY J. BOYLE, JUDGE

EMANUELLA D. GROVES, P.J., and
SEAN C. GALLAGHER, J., CONCUR